801 A.2d 1034

Taurus JACKSON, et al.,

v.

Joseph MILLSTONE.

No. 48, Sept. Term, 2000.

Court of Appeals of Maryland.

June 21, 2002.

576

Marta D. Harting (Kurt J. Fischer and Michelle J. Dickinson of Piper, Marbury, Rudnick & Wolfe LLP, on brief), Baltimore, for Petitioners.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for Respondent.

Argued Before ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), and THEODORE G. BLOOM (Retired, Specially Assigned), JJ.

ELDRIDGE, Judge.

In this action for declaratory and injunctive relief, Taurus Jackson and the estate of Jessica Nettles, by their next friend, Johns Hopkins Hospital, claim that the Director of the Medical Care Financing and Compliance Division of the State's Medical Assistance Program, Maryland Department of Health and Mental Hygiene, deprived the plaintiffs of rights to which they were entitled under the federal Medicaid Act, 42 U.S.C.

§ 1396 *et seq.*[1] The plaintiffs sought a declaratory judgment and an injunction concerning the validity and enforceability of a Maryland medical assistance regulation, set forth in Code of Maryland Regulations (COMAR) 10.09.06.06C, which requires, for preauthorization of medical services for an individual, that the medical provider submit to the Department adequate documentation establishing that the medical service to be rendered is both "necessary" and "appropriate."[2]

The challenge to the regulation arises out of the Department's application of COMAR 10.09.06.06C to two requests for preauthorization for liver transplant surgeries. The plaintiffs argue that the Department violated the federal Medicaid Act when it denied, based on the regulation, preauthorization for their respective "life-saving" liver transplant operations. They contend that for eligible persons under the age of 21, federal law requires only that the medical service be "necessary," and that the state regulation, by requiring that the service also be "appropriate," adds an element not allowed by federal law. The plaintiffs maintain that, with regard to persons under the age of 21, the Department is prohibited from making determinations based, in part, on the "appropriateness" of the procedure in question.

## I.

Before setting forth the facts of the case, we shall briefly

---

1. We shall in this opinion sometimes refer to the Medical Care Financing and Compliance Division, the state Medical Assistance Program, and the Department of Health and Mental Hygiene, collectively as the "Department."

2. COMAR 10.09.06.06C provides as follows:

   "The Department will preauthorize services when the provider submits to the Department or its designee adequate documentation demonstrating that the service to be preauthorized is necessary and appropriate. 'Necessary' means directly related to diagnostic, preventative, curative, palliative, or rehabilitative treatment. 'Appropriate' means an effective service that can be provided, taking into consideration the particular circumstances of the recipient and the relative cost of any alternative services which could be used for the same purpose."

review the medicaid program.[3]  Congress enacted the Medicaid Act in 1965 as Title XIX of the Social Security Act.  *See* 42 U.S.C. § 1396 *et seq.;* 42 C.F.R. §§ 430–456.  The Act was designed to enable states, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services.  To that end, the Act established a medical assistance program, which is a jointly funded collaboration between the states and the federal government.  It is a voluntary program, in which a state may elect, but is not compelled, to participate. When a state elects to participate in the medicaid program, it prepares and submits for approval by the federal Health Care Financing Administration, the federal agency that administers the Federal Medical Assistance Program, a state medicaid plan for the provision of medical assistance that complies with the federal Medicaid Act and with the regulations promulgated by the Secretary of the Department of Health and Human Services.  *See* 42 U.S.C. § 1396(a); 42 C.F.R. §§ 430–456.  If the federal agency approves the state plan, then the state qualifies for federal funding, whereby the federal government will reimburse the state up to 50% of the cost of the medicaid program.  *See* 42 U.S.C. § 1396b(a); 42 U.S.C. § 1396d(b). The federal Office of Inspector General periodically audits state operations to determine whether the operations are "cost-efficient" and whether "[f]unds are being properly expended."  42 C.F.R. § 430.33(a).

While the federal government establishes broad policy, secures state compliance with the statute, and dispenses federal funds to supplement state spending on medicaid, there exists some latitude for each state to determine which of its citizens qualify for this form of medical insurance and which services its program will provide.  The state agency charged with dispensing the state medicaid program is responsible for interpreting, administering, and complying with federal medic-

---

**3.**  For a recent review of the medicaid program, *see* Chief Judge Bell's opinion for the Court in *Dept. of Health v. Campbell,* 364 Md. 108, 771 A.2d 1051 (2001).  *See also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

aid statutes and regulations. Within broad federal rules, each state decides eligibility groups, types and range of services, payment levels for services, and administrative and operating procedures.

Maryland has chosen to participate in the medicaid program. It does so through the Maryland Medical Assistance Program, operated by the Department of Health and Mental Hygiene. *See* Maryland Code (1982, 2000 Repl.Vol., 2001 Supp.) § 15–103 of the Health General Article. The program's director, or a designee, is responsible for the approval or denial of applications for preauthorization for payment. Preauthorization, or approval from the Department, is required before one can receive medical assistance benefits. *See* COMAR 10.09.06.01B(30).

Although the federal Medicaid Act only mandates that states provide medical assistance for those classified as "categorically needy," [4] Maryland's state plan is designed to provide comprehensive health care services for "categorically needy" and "medically needy" persons. *See* §§ 15–201.1, 15–103 of the Health–General Article; COMAR 10.09.06.01B(21). *See also* 42 U.S.C. § 1396a(a)(10)(A), (C) (listing those who qualify as "categorically" and "medically" needy, respectively). Under the Maryland Medicaid Plan, "categorically needy" includes "aged, blind, or disabled persons, or families and children,[5] who are otherwise eligible for Medical Assistance and

---

**4.** *See Schweiker v. Hogan,* 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982) (noting that states have the option of providing coverage to the medically needy); *Smith v. Rasmussen,* 249 F.3d 755, 757 (8th Cir. 2001) (stating that a "state plan must provide for medical assistance to the categorically needy, but the state may choose whether to provide services to those persons within the classification medically needy, who 'do not qualify for some forms of federal assistance but who nonetheless lack the resources to obtain adequate medical care' ") (quoting *Hodgson v. Board of County Comm'rs, County of Hennepin,* 614 F.2d 601, 606 (8th Cir.1980)); *Friedman v. Berger,* 547 F.2d 724 (2d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977) (holding that medicaid assistance to the medically needy is a matter of state option).

**5.** "Child" means "an unmarried person younger than 21 years old." COMAR 10.09.24.02B(12).

who meet the financial eligibility requirements for FIP, SSI, or Optional State Supplement." COMAR 10.09.24.02B(11). Essentially, "categorically needy" persons are those whose income levels are so low that they qualify to receive cash assistance from an approved state program, and they cannot afford to pay for basic needs or medical assistance. The "medically needy," on the other hand, are "persons who are otherwise eligible for Medical Assistance, who are not categorically needy, and whose income and resources are within the limits set under the [s]tate [p]lan." COMAR 10.09.24.02B(38). See Jaffe v. Sharp, 463 F.Supp. 222 (D.Mass.1978) (defining the "medically needy" as individuals and families whose income exceeds that of categorically needy but is nevertheless insufficient to cover medical care). Included among the "medically needy" under the Maryland Medical Assistance Plan are persons under the age of 21. COMAR 10.09.24.03D(2). Taurus Jackson currently qualifies for medical assistance in Maryland as either categorically or medically needy, and he "may select any ... category for which technical eligibility may be established." COMAR 10.09.24.04M(3)(a).

## II.

Taurus Jackson is under the age of 21 and, as pointed out above, is qualified for medicaid benefits. When Taurus was ten years old, he developed end stage liver disease. In July 1992, Taurus received preauthorization by the Department for a liver transplantation and underwent surgery, but the new liver failed a month later. Consequently, in September 1992, Taurus was preauthorized by the Department for a second liver transplantation and again underwent surgery. During this period, Taurus had been placed in foster care facilities, and he was not always given his prescribed medication.

About two and a half years later, in March 1995, Taurus was treated for chronic rejection but with minimal results. His liver function continued to deteriorate, and his primary health care provider, Johns Hopkins Hospital, determined that Taurus was going to die without another liver transplant. The Hospital requested preauthorization for Taurus's third liver

transplantation. In ruling on this request, the Department considered Taurus's complicated past post-operative recovery, whereby his own behavioral problems and the failure to adhere to medication requirements contributed to his previous liver failures. The Department denied the preauthorization request, stating that "a third transplant was not necessary or appropriate for preapproval for reimbursement" because Taurus "remains at great risk for future transplant failure." The Hospital and Taurus requested that the Department reconsider, and the Department asked for supplemental information to be submitted regarding Taurus's psychiatric condition and related behavioral problems. Johns Hopkins Hospital submitted supplemental information that Taurus's psycho-social problems had improved, but the Department found that this information was insufficient. The Department again denied the preauthorization request, stating that Taurus's liver transplantation "procedure does not meet criteria for approval."

On June 27, 1996, a matching liver was found for Taurus. Johns Hopkins Hospital, believing that the liver transplantation procedure was necessary in order to keep Taurus alive, performed at its own expense a successful transplant operation. Taurus remains alive today.

Jessica Nettles was 14 years old when she was diagnosed with liver failure, chronic hepatitis, and an immune deficiency disease. She was qualified for medicaid benefits. In January 1995, Johns Hopkins Hospital, which was Jessica's primary health care provider, requested and received preauthorization from the Department for a liver transplantation for Jessica. No liver became available during the 60 day authorization period, and, as a result, the preauthorization expired. Consequently, in June 1995, the Hospital sought recertification for a liver transplantation for Jessica. This time, the Department requested supplemental information regarding Jessica's other diagnosed medical problems and how they would affect her liver transplantation surgery and chances of recovery. Johns Hopkins Hospital submitted supplemental information and stated that the other diseases would not affect Jessica's chances of a successful liver transplantation. The Department

denied the recertification, stating that, because it could not predict how Jessica's other diseases would affect the liver transplantation surgery, it considered the "liver transplant in [Jessica's] situation experimental." Johns Hopkins Hospital requested that the Department reconsider its decision, and the Hospital submitted additional information, including outside experts' opinions that Jessica would certainly die without the liver transplant and that the operation would be successful even in light of Jessica's other medical problems. Nevertheless, the Department again denied Jessica's preauthorization request, stating that her liver transplantation was not "appropriate."

On April 30, 1996, Johns Hopkins Hospital was notified that a matching liver was available for Jessica. Since the Hospital believed that a liver transplant was the only way to reverse Jessica's end stage liver disease and to save her life, the Hospital at its own expense performed a transplantation that day. Jessica eventually died in September 1997 of liver failure.

In May 1998, Taurus Jackson and Jackie Vandergrift, personal representative of the estate of Jessica Nettles, by their next friend, Johns Hopkins Hospital, filed a complaint in the Circuit Court for Howard County against the Director of the Medical Care Financing and Compliance Division of the Medical Assistance Program, Maryland Department of Health and Mental Hygiene. The plaintiffs alleged that the Department violated the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, by the application of COMAR 10.09.06.06C to requests for preauthorization of life-saving liver transplantation services for both Taurus and Jessica, and by the denial of preauthorization for the "medically necessary" liver transplantations. The plaintiffs sought declaratory and injunctive relief, relying upon the Civil Rights Act of 1871, 42 U.S.C. § 1983, as well as Maryland case-law. Specifically, the plaintiffs requested a declaration that COMAR 10.09.06.06C is invalid because it goes beyond what is authorized by federal law. They sought an injunction preventing the Department from further using COMAR 10.09.06.06C when making preauthorization decisions for

state covered services because of the regulation's allegedly illegal "appropriateness" requirement. The Department moved to dismiss, contending that (1) the case was moot, (2) the suit was barred by sovereign immunity, and (3) the plaintiffs failed to state a claim upon which relief could be granted.

The Circuit Court for Howard County, without any written declaration of rights or written opinion, assumed that the case was not moot and was not barred by sovereign immunity, but granted the motion to dismiss for failure to state a claim. The court did not explain why, in its view, the complaint failed to state a claim. The plaintiffs appealed, and the Court of Special Appeals, in an unreported opinion, affirmed on the ground that the case had become moot. The plaintiffs then filed a petition for a writ of certiorari which we granted. *Jackson v. Millstone*, 359 Md. 668, 755 A.2d 1139 (2000).

The plaintiffs have emphasized that they are not seeking money damages or reimbursement for the expenses associated with Taurus's third liver transplant operation or Jessica's liver transplant operation, and that they are not seeking injunctive relief requiring payment for those operations. Instead, they are seeking "prospective relief" in the form of a declaratory judgment and an injunction concerning the validity of COMAR 10.09.06.06C and the Department's requirement that the medical service be "appropriate" before it will preauthorize the service for children. (Petitioners' brief at 28). The Department in this Court reiterates the three arguments made in the courts below, namely that the case is moot, that sovereign immunity bars the action, and that the challenged regulation is not inconsistent with federal law.

### III.

#### A.

The Court of Special Appeals held "that this case is moot because [the children] have already received liver transplants from Hopkins . . . ." The plaintiffs argue that the issue concerning the validity of the challenged regulation

"is justiciable because it is capable of repetition yet evades review. The Program has adopted a regulation that allows it, in violation of Federal law, to deny preauthorization of medically necessary transplantation services for children based on considerations of 'appropriateness.' The Program applied this regulation to JHH's requests to preauthorize medically necessary, life-saving liver transplantations for the Children, and denied preauthorization based on a cost-benefit analysis. The denial of preauthorization for transplantation services based on an illegal cost-benefit analysis evades review because a new preauthorization must be obtained every 60 days and the operation must be performed immediately as soon as the organ becomes available or the child will die. COMAR 10.09.06.06D. Further, this issue is capable of repetition because the Program has a permanent regulation authorizing it to deny medically necessary operations for children based on a cost-benefit analysis." (Petitioners' brief at 20).

The Department responds by arguing that the particular issue in this case is not " 'capable of repetition' " because each case involving a preauthorization request depends upon the " 'factual circumstances' " of that case. (Respondent's brief at 11). The Department also asserts that there are not very many preauthorization requests for transplant operations under the Maryland medicaid program, and that, if a similar issue arises in the future, " 'there should be no difficulty in having it passed upon as a live issue.' " (*Id.* at 12–13).

Although the action brought on behalf of the estate of Jessica Nettles is moot, Taurus Jackson's action challenging the validity of the Department's regulation is not moot. Moreover, Taurus Jackson's action does *not* fall into that "rare" category of cases where "[w]e have addressed moot questions when 'the public interest clearly will be hurt if the question is not immediately decided,' [and] if the issue is 'likely to recur frequently ....' " *In re Adoption No. 93321055,* 344 Md. 458, 488, 687 A.2d 681, 695 (1997), quoting *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43, 111 A.2d

379, 382 (1954).[6] Rather, in light of the relief being sought, Taurus Jackson's action represents a live controversy, and the suit is clearly allowed under Maryland and federal law.

Taurus is presently qualified for medicaid benefits, and he is under the age of 21. In light of Taurus's prior history, his present liver might well begin to fail, and Johns Hopkins Hospital would likely seek preauthorization for another liver transplant operation. Under these circumstances, Taurus and the Hospital would again face the strong possibility of having the preauthorization denied under the "appropriate" prong of COMAR 10.09.06.06C which, they contend, violates federal law.

Maryland law expressly recognizes that these circumstances present a live controversy subject to a declaratory judgment action. The subtitle of the Maryland Administrative Procedure Act dealing with agency regulations provides, in Code (1984, 1999 Repl.Vol.), § 10–125 of the State Government Article, as follows (emphasis supplied):

" § **10–125. Declaratory judgment.**

(a) *Petition authorized.*—(1)A person may file a petition for a declaratory judgment on the validity of any regulation, whether or not the person has asked the unit to consider the validity of the regulation.

(2) A petition under this section shall be filed with the circuit court for the county where the petitioner resides or has a principal place of business.

(b) *Authority to consider.*—A court may determine the validity of any regulation if it appears to the court that the regulation or its threatened application interferes with or

---

**6.** *See, e.g., J.L. Matthews, Inc. v. Park & Planning,* 368 Md. 71, 96–97, 792 A.2d 288, 302–303 (2002); *Coburn v. Coburn,* 342 Md. 244, 250, 674 A.2d 951, 954 (1996); *In re Riddlemoser,* 317 Md. 496, 502–503, 564 A.2d 812, 815 (1989); *Robinson v. Lee,* 317 Md. 371, 376, 564 A.2d 395, 397 (1989); *State v. Peterson,* 315 Md. 73, 82–83, 553 A.2d 672, 677 (1989); *Mercy Hospital v. Jackson,* 306 Md. 556, 562–563, 510 A.2d 562, 564–565 (1986), and cases there cited.

impairs *or threatens to interfere with or impair a legal right or privilege of the petitioner.*

(c) *Unit as party.*—The unit that adopted the regulation shall be made a party to the proceeding under this section.

(d) *Finding of invalidity.*—Subject to § 10–128 of this subtitle, the court shall declare a provision of a regulation invalid if the court finds that:

(1) the provision violates any provision of the United States or Maryland Constitution;

(2) the provision exceeds the statutory authority of the unit; or

(3) the unit failed to comply with statutory requirements for adoption of the provision."

Taurus is a person who has filed a declaratory judgment action challenging the validity of a regulation, and he contends that the application of the regulation "threatens to interfere with or impair a legal right or privilege" of Taurus under the federal and state medicaid law. The legal issue, concerning the validity of a portion of the regulation, is a substantial one. In light of the past and present circumstances, there is a real possibility that the regulation may in the future be applied adversely to Taurus. This is precisely the type of controversy for which the cause of action under § 10–125 of the State Government Article was enacted.

Moreover, a multitude of cases in this Court recognize the availability of actions for declaratory judgments or injunctions challenging the validity of statutes or regulations which may, in the future, be applied to or adversely affect the plaintiffs. *See, e.g., Maryland HMO's v. Health Services Cost Review Commission,* 356 Md. 581, 741 A.2d 483 (1999) (a member of an HMO, whose future medical insurance premiums might be affected by a hospital rate regulation methodology adopted by the Commission, may bring an action for a declaratory judgment and an injunction challenging the methodology adopted by that government agency); *Maryland Aggregates v. State,* 337 Md. 658, 655 A.2d 886, *cert. denied,* 514 U.S. 1111, 115 S.Ct. 1965, 131 L.Ed.2d 856 (1995) (an action by operators of

quarries, potentially subject to a recently enacted statute, for a declaratory judgment that the statute was invalid and an injunction against the future enforcement of the statute); *Christ v. Department of Natural Resources,* 335 Md. 427, 433 n. 5, 644 A.2d 34, 36–37 n. 5 (1994) (a declaratory judgment action, "authorized by the Maryland Uniform Declaratory Judgment Act, Code (1974, 1989 Repl.Vol.), §§ 3–401 through 3–405 of the Courts and Judicial Proceedings Article, and more specifically by ... § 10–125 of the State Government Article," by a minor potentially subject to an administrative regulation, attacking the validity of the regulation); *Judy v. Schaefer,* 331 Md. 239, 627 A.2d 1039 (1993) (an action for injunctive relief, by persons eligible to receive state medical assistance benefits, challenging the validity of the Governor's order reducing the amount of future assistance); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 554 A.2d 366, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989) (an action for declaratory and injunctive relief by an entity covered by a state statute, against state officials, challenging the validity of the statute on various state and federal constitutional grounds); *American Trucking Ass'ns v. Goldstein,* 312 Md. 583, 541 A.2d 955 (1988) (This Court held that the trial court should enjoin the future enforcement of a tax statute which violated the Commerce Clause); *Department of Transportation v. Armacost,* 311 Md. 64, 532 A.2d 1056 (1987) (a suit for a declaratory judgment and an injunction on the ground that a state agency regulation was not authorized); *Hargrove v. Board of Trustees,* 310 Md. 406, 529 A.2d 1372 (1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988) (a declaratory judgment action, against state officials, challenging on state and federal constitutional grounds a provision of the state pension law); *Joseph H. Munson Co. v. Secretary of State,* 294 Md. 160, 448 A.2d 935 (1982), *affirmed,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (a suit, by an entity potentially affected by a state statute, for a declaratory judgment and to enjoin enforcement of the statute on First Amendment grounds); *Cities Service Co. v. Governor,* 290 Md. 553, 431 A.2d 663 (1981) (an action for declaratory and injunc-

tive relief, by a corporation potentially subject to a recently enacted statute and implementing regulations, against the Governor, the Comptroller, and the Attorney General, challenging the validity of the statute and the regulations on state and federal constitutional grounds); *Bowie Inn v. City of Bowie*, 274 Md. 230, 335 A.2d 679 (1975) (an action for a declaratory judgment and an injunction restraining the enforcement of a local statute); *State v. Lundquist*, 262 Md. 534, 278 A.2d 263 (1971) (This Court affirmed a declaratory judgment that a recently enacted statute violated the First Amendment, and upheld an injunction restraining the State from enforcing the statute); *Bruce v. Director, Department of Chesapeake Bay Affairs*, 261 Md. 585, 276 A.2d 200 (1971) (a suit for a declaratory judgment and an injunction based on the invalidity of a state statute).

■ As the above-cited cases illustrate, when a statute or a regulation such as COMAR 10.09.06.06C may adversely affect a plaintiff in the future, and when the plaintiff has standing to challenge the enactment, the plaintiff's action in a circuit court, against the appropriate government official or agency, for a declaratory judgment or injunction based on the alleged invalidity of the enactment, represents a live controversy. *See Davis v. State*, 183 Md. 385, 390–391, 37 A.2d 880, 884 (1944), where this Court held that, when a plaintiff may be "directly affected by the challenged statute," his declaratory judgment action attacking the statute is not "moot" and that " 'the controversy presented is . . . real and substantial.' "

### B.

■ The above-cited cases are also dispositive of the Department's reliance upon the doctrine of sovereign immunity. Where a statute or regulation is invalid, sovereign immunity does not preclude a declaratory judgment action or suit for an injunction against the governmental official who is responsible for enforcing the statute or regulation. As Judge Delaplaine explained for the Court in *Davis v. State, supra*, 183 Md. at 389, 37 A.2d at 883, "if a person is directly affected

by a statute, there is no reason why he should not be permitted to obtain a judicial declaration that the statute is unconstitutional." The Court in *Davis* went on to point out that, in addition, "a court of equity has power to restrain the enforcement of a void statute or ordinance at the suit of a person injuriously affected." *Ibid.* Specifically with regard to sovereign immunity, the *Davis* opinion held (183 Md. at 393, 37 A.2d at 885):

> "Although a State may not be sued without its consent, an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution, even though such injunction may cause the State law to remain inoperative until the constitutional question is judicially determined."

*See also, e.g., Police Comm'n v. Siegel,* 223 Md. 110, 115, 162 A.2d 727, 729, *cert. denied,* 364 U.S. 909, 81 S.Ct. 273, 5 L.Ed.2d 225 (1960); *Pitts v. State Bd. of Examiners,* 222 Md. 224, 226, 160 A.2d 200, 201 (1960); *Pressman v. State Tax Commission,* 204 Md. 78, 84, 102 A.2d 821, 825 (1954), and cases there cited; *Baltimore Police v. Cherkes,* 140 Md.App. 282, 309–310, 780 A.2d 410, 426–427 (2001).

■ In addition, § 10–125 of the State Government Article specifically authorizes a declaratory judgment action to challenge the validity of a state administrative regulation, and the statute in subsection (c) expressly provides that "[t]he unit that adopted the regulation shall be made a party to the proceeding . . . ." Even if sovereign immunity were otherwise a defense to this type of action (and, as shown by the above-cited cases, it is not a defense), § 10–125 would constitute a waiver of such immunity.

■ Furthermore, regarding Taurus's action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, it is clear that the defendant-respondent Director of the Medical Care Financing and Compliance Administration has no immunity from prospective relief. In *Ritchie v. Donnelly,* 324 Md. 344, 356, 597 A.2d 432, 437 (1991), this Court explained:

"Moreover, as to a claim for prospective relief, a state officer or employee is a 'person' under § 1983 regardless of the capacity in which he is acting. An action for an injunction may be maintained under § 1983 against a state officer or employee even though the officer or employee was sued in his official capacity. *Will v. Michigan Dept. of State Police, supra,* 491 U.S. [58] at 71 n. 10, 109 S.Ct. [2304] at 2311 n. 10, 105 L.Ed.2d [45] at 58 n. 10 [1989]; *Sterling v. Constantin,* 287 U.S. 378, 393, 53 S.Ct. 190, 193, 77 L.Ed. 375, 382 (1932). *Ex parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 454, 52 L.Ed. 714, 729 (1908); *Henne v. Wright,* 904 F.2d 1208, 1211 n. 2 (8th Cir.1990), *cert. denied,* 498 U.S. 1032, 111 S.Ct. 692, 112 L.Ed.2d 682 (1991); *Chaloux v. Killeen,* 886 F.2d 247, 252 (9th Cir.1989); *Harrington v. Schossow,* 457 N.W.2d 583, 586 (Iowa 1990)."

*See also Okwa v. Harper,* 360 Md. 161, 193 n. 16, 757 A.2d 118, 135 n. 16 (2000).

More specifically, courts have rejected the defense of immunity in actions for declaratory or injunctive relief against state officials, by eligible persons or health care providers under the medicaid program, who claim that state practices violate the federal Medicaid Act and/or implementing federal regulations. *See, e.g., Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 512, 110 S.Ct. 2510, 2518–2519, 110 L.Ed.2d 455, 468–469 (1990) (action against state officials, under 42 U.S.C. § 1983, for prospective injunctive relief, with the Court pointing out that the Medicaid Act "imposes a binding obligation on States participating in the Medicaid program ... and ... this obligation is enforceable under § 1983 by health care providers"); *Westside Mothers v. Haveman,* 289 F.3d 852 (6th Cir.2002) (Medicaid-eligible children under the age of 21 are entitled to injunctive relief, under 42 U.S.C. § 1983, requiring state officials to comply with the Medicaid Act); *Antrican v. Odom,* 290 F.3d 178 (4th Cir.2002) (Sovereign immunity does not preclude the plaintiffs from obtaining "an injunction mandating that in the future, State officials bring the [state] Medicaid program into compliance with the Medicaid Act. This mandate might potentially impact the State treasury, but it is nonetheless

prospective"); *Lewis v. New Mexico Dept. of Health,* 261 F.3d 970 (10th Cir.2001) (The immunity defense is not available to state officials who are sued for injunctive relief to bring the state medicaid program in conformance with the Medicaid Act); *Boatman v. Hammons,* 164 F.3d 286 (6th Cir.1998) (Medicaid recipients are entitled, under 42 U.S.C. § 1983, to an injunction requiring state officials to comply with the Medicaid Act). *See also Dalton v. Little Rock Family Planning Services,* 516 U.S. 474, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996).

## IV.

Prior to addressing the substance of the petitioners' challenge to COMAR 10.09.06.06C, we shall comment upon a procedural error committed by the Circuit Court. As previously mentioned, the Circuit Court assumed that this action for a declaratory judgment and injunctive relief was neither moot nor barred by sovereign immunity, and the court resolved the case on its merits. Instead of filing a written declaration of rights, however, the Circuit Court's decision consisted of a brief order stating that "the court finds [that] the Complaint fails to state a claim upon which the requested relief could be granted. Therefore, the Motion to Dismiss is granted."

Even if we agreed with the Department that the challenged regulation did not violate federal law, we would be required to reverse the Circuit Court's decision for failure to file a written declaratory judgment. The Court in *Harford Mutual v. Woodfin,* 344 Md. 399, 414–415, 687 A.2d 652, 659 (1997), explained as follows:

"This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, 'the trial court must render a declaratory judgment.' *Christ v. Department,* 335 Md. 427, 435, 644 A.2d 34, 38 (1994). '[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral

rulings and a grant of . . . judgment in favor of the prevailing party.' *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995), and cases there cited.

"The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary. As this Court stated many years ago, 'whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made.' *Case v. Comptroller,* 219 Md. 282, 288, 149 A.2d 6, 9 (1959). *See also, e.g., Christ v. Department, supra,* 335 Md. at 435–436, 644 A.2d at 38 ('[t]he court's rejection of the plaintiff's position on the merits furnishes no ground for failure to file a declaratory judgment); *Broadwater v. State,* 303 Md. 461, 467, 494 A.2d 934, 937 (1985) ('the trial judge should have declared the rights of the parties even if such declaration might be contrary to the desires of the plaintiff'); *East v. Gilchrist,* 293 Md. 453, 461 n. 3, 445 A.2d 343, 347 n. 3 (1982) ('where a plaintiff seeks a declaratory judgment . . ., and the court's conclusion . . . is exactly opposite from the plaintiff's contention, nevertheless the court must, under the plaintiff's prayer for relief, issue a declaratory judgment'); *Shapiro v. County Comm.,* 219 Md. 298, 302–303, 149 A.2d 396, 399 (1959) ('even though the plaintiff may be on the losing side of the dispute, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory decree')."

More recently, in *Allstate v. State Farm,* 363 Md. 106, 117 n. 1, 767 A.2d 831, 837 n. 1 (2001), Judge Wilner for the Court stated:

"Once again, we are presented with a declaratory judgment action in which there is no written declaratory judgment. We have admonished trial courts that, when a declaratory judgment action is brought and the controversy is appropriate for resolution by declaratory judgment, the court must enter a declaratory judgment and that judgment, defining the rights and obligations of the parties or

the status of the thing in controversy, *must be in writing.* It is not permissible for the court to issue an oral declaration. The text of the judgment must be in writing. *See Harford Mutual Ins. Co. v. Woodfin,* 344 Md. 399, 414–15, 687 A.2d 652, 659 (1997); *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995); *Christ v. Department of Natural Resources,* 335 Md. 427, 435, 644 A.2d 34, 38 (1994). Nor, since the 1997 amendment to Maryland Rule 2–601(a), is it permissible for the declaratory judgment to be part of a memorandum. That rule requires that '[e]ach judgment shall be set forth on a separate document.' When entering a declaratory judgment, the court must, in a separate document, state in writing its declaration of the rights of the parties, along with any other order that is intended to be part of the judgment. Although the judgment may recite that it is based on the reasons set forth in an accompanying memorandum, the terms of the declaratory judgment itself must be set forth separately. Incorporating by reference an earlier oral ruling is not sufficient, as no one would be able to discern the actual declaration of rights from the document posing as the judgment. This is not just a matter of complying with a hyper-technical rule. The requirement that the court enter its declaration in writing is for the purpose of giving the parties and the public fair notice of what the court has determined."

*See also, e.g., Baltimore v. Ross,* 365 Md. 351, 358 n. 6, 779 A.2d 380, 384 n. 6 (2001); *Bushey v. Northern Assurance,* 362 Md. 626, 651–652, 766 A.2d 598, 611–612 (2001); *Maryland HMO's v. Health Services Cost Review Commission,* 356 Md. 581, 603, 741 A.2d 483, 495 (1999).

## V.

As previously discussed, a participating state is given some latitude in determining the scope of coverage, eligibility for assistance, and services that its medical assistance program chooses to provide. *See Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464, 472 (1977); *Meusberger v. Palmer,* 900 F.2d 1280, 1282 (8th Cir.1990) (stating that

participating states "have some discretion in determining which medical services to cover under their [m]edicaid program"). Nevertheless, despite a state's latitude in adopting its particular medical assistance program, once a state elects to participate in the federal medicaid program, it must comply with all requirements of the Medicaid Act and governing regulations. *See Dept. of Health v. Campbell,* 364 Md. 108, 112, 771 A.2d 1051, 1053 (2001); *Pereira v. Kozlowski,* 996 F.2d 723 (4th Cir.1993); *Mississippi Hosp. Ass'n v. Heckler,* 701 F.2d 511 (5th Cir.1983); *Smith v. Miller,* 665 F.2d 172 (7th Cir.1981); *Webster v. USLIFE Title Co. of Arizona,* 123 Ariz. 130, 598 P.2d 108 (1979); *Potter v. James,* 499 F.Supp. 607 (M.D.Ala.1980); *Montgomery County Ger. & Rehab. Ctr. v. Commonwealth of Pennsylvania,* 75 Pa.Cmwlth. 248, 462 A.2d 325 (1983).

While the Medicaid Act does not mandate state assistance for specific medical procedures, such as organ transplantations, Congress does explicitly require state programs to provide financial assistance to qualified recipients for seven broad areas of medical treatment. *See* 42 U.S.C. § 1396a(a)(10)(A); *Beal v. Doe, supra,* 432 U.S. at 444, 97 S.Ct. at 2370, 53 L.Ed.2d at 472; *Miller v. Whitburn,* 10 F.3d 1315, 1316–1317 (7th Cir.1993); *Pittman v. Secr., Florida Dept. of Health and Rehab. Serv.,* 998 F.2d 887, 889 (11th Cir.1993); *Pereira v. Kozlowski, supra,* 996 F.2d at 724. These mandatory medical services include (1) inpatient hospital services; (2) outpatient hospital services; (3) laboratory and x-ray services; (4) nursing facility services for persons age 21 and over, early and periodic screening, diagnostic, and treatment services (EPSDT services) for persons under the age of 21, and family planning services and supplies furnished to individuals of childbearing age; (5) physician services; (6) nurse-midwife services; and (7) nurse practitioner services. *See* 42 U.S.C. § 1396d(a)(1–5), (17), (21). EPSDT services include certain screening, vision, dental, and hearing services (42 U.S.C. §§ 1396d(r)(1)-(4)) as well as "such other *necessary* ... treatment ... to correct or ameliorate ... conditions

discovered by the screening services." 42 U.S.C. § 1396d(r)(5) (emphasis added).

Maryland's EPSDT screening services provide "preventive health care ... including medical and dental services, in order to assess growth and development and to detect and treat health problems in medical assistance individuals under 21 years old." COMAR 10.09.23.01B(8).[7] The EPSDT program covers "all medically necessary services to correct physical and mental problems identified during the EPSDT screenings, that are allowable under the federal Medicaid program ...." COMAR 10.09.23.05C. The regulations governing Maryland's Medical Assistance program clearly state that any limits [8] on covered services or treatments, which would otherwise be effective "are not applicable for individuals under 21 years old when it is shown that the treatments or services are *medically necessary* to correct or lessen health problems detected or suspected by the screening service." COMAR 10.09.23.06A (emphasis added).

Because the federally-mandated EPSDT program covers all medically necessary procedures, without reference to an "appropriateness" analysis, the plaintiffs argue that a child is entitled to receive preauthorization for state-funded organ transplantation surgeries upon submission of documentation that the procedures are medically necessary. The plaintiffs assert that Maryland wrongfully requires both a "medically necessary" and an "appropriate" analysis, which resulted in the Department's denial of Taurus's and Jessica's preauthorization requests for their required liver transplantation procedures. Consequently, the plaintiffs insist that the Maryland program illegally adds a second criterion to the liver trans-

---

**7.** Taurus will not loose medicaid eligibility once he turns 22, because he will still qualify as categorically needy due to his economic status. Nonetheless, Taurus's age is relevant because Maryland's medicaid guidelines regarding preauthorization for individuals under 21 are less stringent, to ensure that this group of "medically needy" individuals receives all medically necessary care.

**8.** *See* COMAR 10.09.06.05, Limitations; 10.09.23.06, Limitations.

plantation preauthorization process—that the procedure not only be necessary, but also be *appropriate*. COMAR 10.09.06.06C.[9] The challenged regulation expressly states that preauthorization decisions are based upon an "appropriateness" analysis, which takes into consideration such factors as the "effectiveness" of the treatment. COMAR 10.09.06.06C.[10] "Necessary" is defined as "directly related to diagnostic, preventative, curative, palliative, or rehabilitative treatment." *Ibid.* "Appropriate" is defined as "an effective service that can be provided, taking into consideration the particular circumstances of the recipient and the relative cost of any alternative services which could be used for the same purpose." *Ibid.*

In measuring the "effectiveness," the plaintiffs assert that the Maryland program illegally focuses on the idiosyncrasies of each individual patient, thereby permitting the Department to claim that certain liver transplants are "experimental." These factors go beyond that which is considered "necessary," or that which is the "only option for treatment" in order to sustain lives. (Petitioners' Brief at 19). Thus, plaintiffs argue that the use of COMAR 10.09.06:06C, in preauthorization decisions for children under the age of 21, violates a child's rights under federal law.

■ Despite the latitude which a state has in adopting a medicaid plan, a state plan must establish " 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Medicaid].' " *Harris v. McRae*, 448 U.S. 297, 302, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, 795 (1980), quoting *Beal v. Doe*, *supra*, 432 U.S. at 441, 97 S.Ct. at 2369, 53 L.Ed.2d at 470. *See* 42 U.S.C. § 1396a(a)(17). For example, regulations implementing the Medicaid Act require that each medical service

---

**9.** As previously noted, *supra* n. 2, COMAR 10.09.06.06C states that preauthorization will be granted when "adequate documentation demonstrating that the service to be preauthorized is necessary and appropriate."

**10.** *Supra*, n. 2.

provided by a state be "sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. 440.230(b). *See* 42 U.S.C. § 1396a(a)(10)(B), (C). A state may not arbitrarily deny or reduce the amount, duration, or scope of a required service to an otherwise eligible recipient "solely because of the diagnosis, type of illness, or condition." 42 C.F.R. 440.230(c).

Whether or not organ transplantations are a service that is required to be funded by the states, in accordance with the federal Act, has been the subject of some debate. Before 1985, the Medicaid Act contained no provision specifically covering organ transplantations. In 1985, however, Congress amended the Medicaid Act to add a provision specifically referring to them. In essence, the amendment merely delineates conditions for federal funding of organ transplants. *See* 42 U.S.C. § 1396b(i)(1). For example, 42 U.S.C. § 1396b(i)(1) provides that a state must have written standards which embody the state's Medicaid plan regarding the coverage of organ transplants. Those state standards must guarantee that similarly situated individuals are treated alike, and any restrictions which the state imposes must assure accessibility of high quality care to all eligible individuals. *Ibid.*[11] Maryland, however, has made it clear, through COMAR 10.09.06.04, that the state *will fund* organ transplantations.[12] Further-

---

**11.** The organ transplant provision, 42 U.S.C. § 1396b(i)(1), specifically provides:

"(i) **Payment for organ transplants** .... Payment under the preceding provisions of this section shall not be made—

(1) for organ transplant procedures unless the State plan provides for written standards respecting the coverage of such procedures and unless such standards provide that—

(A) similarly situated individuals are treated alike; and

(B) any restriction, on the facilities or practitioners which may provide such procedures, is consistent with the accessibility of high quality care to individuals eligible for the procedures under the State plan."

**12.** COMAR 10.09.06.04 reads, in relevant part:

"**Covered Services.**

The Program covers the following services:

more, " 'once a state has adopted a policy to cover a category of organ transplants, it may not arbitrarily or unreasonably deny services to an otherwise eligible Medicaid recipient.' " *Dexter v. Kirschner*, 984 F.2d 979, 984 (9th Cir.1992), quoting *Meusberger v. Palmer*, 900 F.2d 1280, 1282 (8th Cir.1990).

 As the Court has stated, once Maryland elected to participate in the federal Medicaid program, it agreed to comply with all mandates provided in the federal Medicaid Act and other related provisions. The federal requirement most relevant to this appeal is that participating states are required to administer periodic medical screenings to persons under 21, and to provide medically necessary treatment for such ailments and conditions that are discovered during those screenings. The federal program makes no mention of utilizing an "appropriateness" analysis in determining whether a medicaid-eligible child should receive medically necessary treatments provided through EPSDT services. Nevertheless, the Maryland medicaid provision regarding preauthorization of services, COMAR 10.09.06.06C, requires that medically necessary treatment for a medicaid-eligible child must also be "appropriate," which is beyond the dictates of federal law. The federal guidelines allow states no discretion to use an "appropriateness" test in deciding whether a person under 21 can receive medically necessary treatment. Therefore, because the provision imposes additional criteria upon qualified recipients, which illegally denies services to those who would normally receive medically necessary treatment, we agree with the plaintiffs that COMAR 10.09.06.06C is partially invalid under federal law.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR*

---

A. Inpatient hospital services:

(8) Organ transplantations in hospitals that are designated by the Secretary as national transplantation referral centers."

*FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*